## WHITE v. TAYLOR et al.
## No. 1755.

Court of Civil Appeals of Texas. Beaumont.
May 28, 1931.

Kitching & Kenna, of Beaumont, and Fred A. White, of Port Arthur, for plaintiff in error.

J. M. Sanders, of Center, for defendants in error.

WALKER, J.

Our judgment in this case, 11 S.W.(2d) 374, was reversed by the Commission of Appeals, 36 S.W.(2d) 181, with instructions that we determine the merits of the case with reference to the statement of facts. Plaintiff in error will be designated as appellant, and defendants in error as appellees.

The trial court's conclusions of fact and law are given in full in our original opinion reported as above indicated. While appellant's assignments are directed.against these several conclusions, in substance they present the contention that, on the undisputed evidence, judgment should have been entered in his favor for the relief prayed for.

The facts are as follows: The two Smith boys and the two White boys named in the trial court's conclusions were the only children of Mrs. N. M. White, and as she died intestate they inherited her separate estate under the statutes of descent and distribution. However, she and her husband, W. D. White, the father of the two White boys, made advancements to B. B. White, in full satisfaction of his interest in their separate estates, as well as in their community estate. The facts of the record fully support the trial court's conclusion that B. B. White, though he joined in the deed to Boyer Taylor and afterwards conveyed his interest in the land in question to appellant Fred A. White, had, in fact, no interest in the land. On this conclusion this land was owned by the two Smith boys and appellant, each owning a one-third interest, and that only appellant's interest is in controversy herein.

On the night of the 22nd of November, after joining in the execution of the deed to Mr. Taylor on the 21st, appellant talked over the phone with Mr. Taylor at Teneha, Texas, for the purpose of telling him when the deed was delivered to him by the Smith boys to pay his interest in the money and B. B. White's interest in the money into Mr. Motley's bank in Teneha. Mr. Taylor testified that he did not hear appellant give him this instruction but he testified further that he understood appellant was talking about this trade and he told appellant, to quote his language, "our deal was all off—that I didn't get the money and that is all the conversation I had with

him." Though Mr. Taylor told appellant the "deal was all off," when the Smith boys brought him the deed, not being able to pay them the $25.00 per acre called for in the trade with appellant, he made a new trade with them to the following effect: they agreed with him to take $15.00 per acre and to deliver him the deed at that price; he was then to deed the land to Mr. Motley, who was to advance to the Smith boys the $15.00 per acre and Mr. Motley was to sell the land back to him at $20.00 per acre. This general trade was fully consummated and the Smith boys were paid the $15.00 per acre, which they appropriated to their own use. Neither appellant nor B. B. White was consulted about this trade and knew nothing about it until several days after it was consummated. When appellant was advised of the trade in question he instituted this suit to recover his interest in the land.

The deed was delivered to Mr. Taylor as appellant had signed it. The deed from Mr. Taylor to Mr. Motley contained the following recitations:

"The State of Texas
"County of Shelby
"Know all men by these presents; That I, Boyer Taylor, of the County of Shelby, state of Texas, for and in consideration of the sum of Seven Hundred Dollars, to me in hand paid by Luke Motley, as follows: I having bought this 34 acres from H. L. Smith and W. W. Smith and Ben B. White and Fred A. White, and finding myself unable to pay for the same have together with the above named parties by this deed conveyed title to the same stating that I have paid nothing on same and that Luke Motley is making full payment on said land."

The following excerpts from the testimony of Mr. Motley show how and why the deed was delivered to Mr. Taylor without appellant's knowledge or consent.

"Yes I say they wanted to borrow $25.00 an acre to pay for the land, Boyer did. We never reached any agreement on that line at all. I knew according to the deed that Boyer Taylor had agreed to pay $25.00 an acre as the purchase price. I knew that also from Boyer Taylor's statement at the time, that he had agreed to pay $25.00 an acre for it. They suggested that we find some way to negotiate without going to Port Arthur. I began to have negotiations with the boys, not to see how I could get title to the land without going to Port Arthur, but to see how Boyer would get it. They suggested that and we discussed it among ourselves. Those gentlemen lived at different places. One at Port Arthur and the other at Nacogdoches, and they were trying to simplify the matter and get the cash too.

"There was a deed there for a certain consideration they had agreed on. Taylor told me they had agreed on the consideration in that deed they had there. No they didn't want to get title into someone else for a less consideration, but so he could get a lien on the land. The idea was not how to negotiate it in a way to get it done at a new consideration without going to Port Arthur to see Ben and Fred White, but how will we get the land to you, Boyer, at the price for the land that they had agreed to take—$15.00 an acre. The two Smiths had agreed to that, they had the deed. No. Boyer did not agree to pay them $15.00 an acre for the land, Boyer agreed to pay me $20.00 an acre for the land conditioned that I was to pay them $15.00. I was to sell it to Boyer for $20.00 and buy it from Smiths at $15.00, making $5.00 an acre on the land. As to whether or not I knew that Fred White and Ben B. White had not agreed to this proposition at the time I will say that they had two representatives that did. I didn't know personally that they had not agreed to take $15.00 an acre for the land. Their representatives said they would.

"In the first place it would have been expensive for them to go back down to Port Arthur and have those boys sign again and they wanted the cash right now and so I did not know there was a family row or anything like that on or would occur about the matter and when they agreed to take $15.00 an acre' I said 'Give me a deed' and I said 'Boyer, you understand the price and if you are going to be satisfied say so, and if not say so. I won't pay that price for it unless I can sell it to you on credit for $20.00'. They explained to me that it would be expensive to go down to see Fred and Ben White. They explained that and I didn't care. I can't swear that one of the Smith boys was an engineer on the railroad. I don't know. I understood at that time that he was out of employment.

"Henry Smith, Boyer Taylor, or W. W. Smith did not exhibit any power of attorney to me showing they had a right to act for Ben B. White or Fred White. Nothing but just being a brother and they had the deed in their hands. I relied on the relationship and he had the deed. Because they had a deed showing a $25.00 consideration and I knew of the relationship, that gave them the right to sell it for $15.00, and I protected myself by saying 'Boyer, don't take it unless you are going to be satisfied with that—if you are not sure it is all right and that the boys will be satisfied, don't take it.' No. There was no doubt in my mind as to whether Fred White and Ben White would be satisfied about it. I cautioned Boyer Taylor to be sure he was right about it because I was giving him a quit claim title and I wanted him to be sure,

and I was carrying the vendor's lien and I wanted him to be satisfied about the title and I suggested to him to go to a lawyer, but I do not know whether he did or not. He said he knew it all his life.

"Both the Smiths were in there when I paid the cash for the land. I think I paid it to H. L. Smith. I paid him $15.00 an acre. I did not pay any money to Fred White, nor to Ben White. At the time I paid the $15.00 an acre to H. L. Smith I knew that the only deed that Fred White or Ben White signed to this property was a deed reciting a cash consideration of $25.00. In regard to whether I had any notice or authority from Fred White or Ben White, individually, or an agreement from them at all that they would take anything less than $25.00 an acre for this land, I was buying the land from Boyer—I was not buying it from those boys. No I didn't buy from them. I bought from Boyer Taylor. I bought from Boyer for the purpose of him buying it from the Whites. In other words I was helping him buy the land. No. He and I were not negotiating some way so he could pay $15.00 instead of $25.00 for the land, he was trying to get the land and I was helping him. I don't know that I was helping him get it for $15.00 when I knew he had agreed to pay $25.00. I didn't say he told me he had paid $25.00 for it, I said the deed recited that. I didn't say he said he had given $25.00. I said he proposed to borrow $25.00 to pay for it and that is where the argument came up."

" * * * The only diligence I used about finding out about whether or not it was a bona fide transaction, was whether or not Boyer Taylor was satisfied. I knew at the time he was the vendee, or transferee in the deed to me. He was the transferee in the deed from H. L. Smith, W. W. Smith, Fred A. White and Ben B. White and then to me, and me back to him. As to whether or not I knew at the time I told him that I would be satisfied if he was satisfied that his interest in this matter was adverse to H. L. and W. W. Smith and the other two grantors, that whatever he had to pay would inure to their benefit, I left it to his judgment about the title, but the price of the land was between he and I. I talked with the two Smiths, his brothers, and they said it was satisfactory to get possession of the land for $15.00 an acre without having to go to the expense of going to Port Arthur to get their signatures, and I assumed that they knew what they were talking about, and I went into the deal."

" * * * I knew at the time I bought this land that the deed stated that Fred White and Ben B. White had received their half of the consideration. As to whether or not I knew they had not received it, the deed said they had. I am telling you what the deed says. I'll swear that I don't know whether

they did or not. I reconcile this testimony and my testimony that Boyer Taylor told me that he had not paid for the land. Boyer told me he had not paid for it, but Smiths may have paid Fred. I didn't know. They said they had paid a lot of funeral expenses. I don't know whether they did or not—he says they didn't but I took the brothers' word for it. I relied on representations made by others. They both said they were going to sell it today and Boyer was willing to buy it. I never said that they told me that they had paid for it."

On the statement made, the conclusions that appellant constituted H. L. Smith his agent to deliver the deed to Boyer Taylor and to receive therefor a consideration, to be agreed upon between Smith and Taylor, and that "Boyer Taylor and Luke Motley, defendants herein, purchased the land involved in this suit from H. L. and W. W. Smith, without any notice whatever that the plaintiff, Fred A. White, and his brother, B. B. White, had any notice or claim to said land; that both the said Boyer Taylor and Luke Motley paid a valuable consideration for said land and without any notice of any of the facts as alleged by plaintiff relating to any fraud of H. L. Smith and W. W. Smith, or either of them, and without any notice of any fact or facts that would place either of them upon an inquiry," and the conclusions of law, based upon these conclusions of fact, are wholly without support.

Under all the facts, H. L. Smith was nothing more than the special agent of appellant to deliver the deed to Mr. Taylor upon the agreed price of $25 per acre. The inquiry then is whether or not appellees are innocent holders of appellant's title. To sustain this conclusion they make the following contentions:

(a) H. L. Smith was appellant's halfbrother and, therefore, his agent or representative. The mere circumstance of blood relationship was not sufficient, on these facts, to raise the issue of agency in H. L. Smith to represent appellant in the new trade.

(b) Appellees did not know that the Smith boys had not paid appellant for his interest in the land when he delivered the deed to H. L. Smith in Port Arthur. Appellees strongly argued on oral submission that appellant rested under the burden of proving that they did not know that appellant had not been paid by the Smith boys, and as that proof was not made, they were, as a matter of law, innocent purchasers. We do not think this proposition is sound. But if the proposition be conceded, the burden was fully discharged by appellant. Admittedly, all parties knew that Mr. Taylor had not paid the consideration. But appellees stress the point that since appellant's deed to Mr. Tay-

lor recited that the consideration had been paid, they had the right to act upon the presumption that someone had paid it and, therefore, appellant had no further interest in the land. That is not a proper construction of the deed. The effect of the whole deed, as construed by all parties, and as the law would construe it, was, not that the consideration had been paid, but that it would be paid by Mr. Taylor, and that the delivery of the deed and its possession by him would constitute evidence of payment. There is nothing in the deed to suggest that the Smith boys had paid appellant. They were not buying, they were selling the land. Why should any prudent man assume that one grantor has voluntarily paid for the grantee the consideration due his cograntor?

(c) Having delivered his deed to H. L. Smith, to be delivered by him to Mr. Taylor at $25 per acre, the law made Smith appellant's agent for the purpose of delivering the deed to Mr. Taylor either upon the agreed consideration or upon a new consideration, to be agreed upon between Mr. Taylor and Smith, and upon such terms as they might agree upon. In its ultimate analysis appellees' case must rest upon this proposition. But the proposition is not sound. Appellees knew the actual scope of the agency of the Smith boys, which was merely to deliver appellant's deed to Mr. Taylor and to receive from him the agreed consideration, and every circumstance in the record precludes and forbids any finding that they could have been misled or deceived as to the actual powers possessed by the Smith boys.

It is the law that one dealing with an agent, with actual knowledge of the scope of the agent's power, can acquire no right against the principal not within his grant of power to his agent. Thus, where one buys from an agent with knowledge that the agent has no power to sell upon the terms agreed upon between the buyer and the agent, the principal is not divested of his title unless he subsequently ratifies the transaction. Case v. Jennings, 17 Tex. 661, is directly in point upon this proposition. Thus the court said: "If he [the purchaser] was advised of the nature of the agency, he must have known that the authority, simply to sell for money to pay debts, did not authorize the sale to himself on a credit. If he was advised only of the authority of the agent to sell generally, he must have known that the attempt of the agent to run off the property and conceal it from his principal, was a violation of his duty to the latter, which put an end to the confidential relations between them, and necessarily determined the agency." Corpus Juris, vol. 2, p. 608, subject "Agency," says: "The sale completes the transaction, and there is no presumption, from the mere authority to sell, that the agency continues so as to * * * make another contract for the sale of the property or to offer the purchaser further inducements to carry out its terms."

The court erred in rendering judgment in favor of appellees against appellant, which judgment is here reversed and judgment rendered in favor of appellant against appellees, with writ of possession for his one-third interest in the land in controversy.

Reversed and rendered.